## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**ELLA MAE WILSON,**

     **Plaintiff,**

**vs.**                    **Case No.: 4:15cv597-RH/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

     **Defendant.**
_____/

## REPORT AND RECOMMENDATION

     This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act (Act) and application for Supplemental Security Income (SSI) under Title XVI of the

Act.  After consideration of the record, it is recommended that the decision

of the Commissioner be affirmed and judgment entered for Defendant.

## I.  Procedural History

On July 26, 2012, Plaintiff, Ella Mae Wilson, filed applications for SIS

and DIB, alleging disability beginning on July 24, 2012.  Tr. 106, 216-25.

(Citations to the Transcript/Administrative Record, ECF No. 8, shall be by

the symbol "Tr." followed by a page number that appears in the lower right

corner.)  As noted in disability reports and other documents, Plaintiff

alleged she was disabled due to sleep apnea, shortness of breath, arthritis,

weak knees, back problems, and hypertension.  Tr. 57, 66, 79, 89, 254,

288.[1]  Plaintiff's applications were denied initially on October 5, 2012, and

upon reconsideration on November 27, 2012.  Tr. 99-100, 75-76, 106, 137-

42, 145-56.  On February 1, 2013, Plaintiff filed a request for hearing.

Tr. 106, 157-58.  Plaintiff's date last insured for DIB was December 31,

2017.  Tr. 106.

On June 18, 2014, a hearing was held by Administrative Law Judge

---

[1] Plaintiff previously applied for DIB and SSI in April 2012, alleging she had become disabled on April 9, 2012.  Tr. 200-13.  On April 11, 2012, the Commissioner denied Plaintiff's applications because she was working.  Tr. 125-31; *see* Tr. 242 (2012 earnings).

(ALJ) Steven L. Carnes in Tallahassee, Florida.  Tr. 8-56, 106.  Plaintiff

was represented at the hearing by Kelly Berglund, an attorney.[2]  Tr. 8, 10,

106, 196-99.  Plaintiff testified during the hearing.  Tr. 17-43.  Gail E.

Jarrell, an impartial vocational expert, also testified.  Tr. 44-54, 106, 186-88

(Resume).  The ALJ admitted Exhibits 1A through 12A, 1B through 19B,

1D through 12D, 1E through 13E, and 1F through 12F.  Tr. 16.

During the hearing, the ALJ and Plaintiff's counsel discussed the

status of the record pertaining to Plaintiff's claim that she suffered from

sleep apnea.  Tr. 22-28.  The ALJ stated that there were no medical

records relating to obstructive sleep apnea (OSA) that supported Plaintiff's

testimony, except for her statements to the consultative examiner

(Wayne Sampson, M.D.), *see* Tr. 359, 361.[3]  Tr. 22.  The ALJ advised that

---

[2]  At the outset of the hearing, Plaintiff's counsel provided an opening statement and advised that Plaintiff was a person closely approaching advanced age, had an 11th grade education, and a great work history from 1981 to 2012, "where she worked hard as a housekeeper and a cook."  Tr. 14.  According to counsel, Plaintiff has several severe impairments including high blood pressure, degenerative disc disease, sciatica, sleep apnea, and chronic kidney disease.  She also suffers from shortness of breath, coughing, and dizziness and a history of sleep apnea.  She was also suffering from some depression, but did not allege any severe mental impairments.  Tr. 14, 16.  Counsel believed that Plaintiff would be disabled under Grid 201.19.  *Id.*  Counsel did not mention that any of Plaintiff's impairments met or equaled the severity of one of the listed impairments.  *See infra* at 5, ¶ 3.

[3]  Dr. Sampson noted, in part, that Plaintiff's past medical history included "obstructive sleep apnea, diagnosed 9 to 10 years ago"; a family history that included

the record would remain open for two weeks to allow Plaintiff's counsel to

obtain additional medical records.  Tr. 54-55; *see* Tr. 22-26, for a

discussion of the missing records.

Records from Archbold Memorial Hospital from September 25, 2012,

through November 25, 2013, Exhibit 13F, were received by the ALJ after

the hearing on or about July 14, 2014, Tr. 431.  Tr. 124, 431-46;

Tr. 110.  These records refer to a January 22, 2003, pulmonary function

test that is a subject of this review and some other records.  Tr. 431-46.

On August 22, 2014, ALJ Carnes entered a decision denying

Plaintiff's DIB and SIS applications for benefits.  Tr. 106-19.  On September

16, 2014, Plaintiff filed a request for review.  Tr. 5-6.  On October 2, 2015,

the Appeals Council denied Plaintiff's request for review, making the ALJ's

---

sleep apnea among siblings; Plaintiff denied chronic, non-refreshed sleep; Plaintiff did
not use a CPAP, she could not afford it, but reported that these symptoms associated
with sleep apnea improved after she lost weight and that she denied chest pain and
dyspnea (shortness of breath).  Tr. 359-60 (Exhibit 4F).  Examination of Plaintiff's lungs
indicated they were clear with good air entry.  Tr. 360.  Dr. Sampson's impressions
included history of obstructive sleep apnea – stable.  Tr. 361.  Patient notes from
January 28, 2011 (Exhibit 1F) indicate a history of exertional dyspnea and a second
Pulmonary Function Test (PFT), interpreted as a severe restriction.  Tr. 111.  A
December 23, 2013, patient note (Exhibit 9F) stated Plaintiff declined another PFT.
Tr. 112.  Exhibit 12F contains Dr. Crenshaw's notes of January 2014.  Dr. Crenshaw
noted that Plaintiff raised no complaints and she denied any chest discomfort or
shortness of breath.  Tr. 113.

decision the Commissioner's final determination.  Tr. 1-4; 20 C.F.R.

§ 404.981.

On December 5, 2015, Plaintiff filed a Complaint in this Court seeking

judicial review.  ECF No. 1.  The parties filed memoranda of law, ECF Nos.

16 & 17, which have been considered.  Plaintiff filed a Reply, which has

been considered.  ECF No. 18.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this

appeal.

1. "The claimant has not engaged in substantial gainful activity since July 24, 2012, the alleged onset date." Tr. 108.

2. "The claimant has the following severe impairments: hypertension; degenerative disc disease; and stage III chronic kidney disease." Tr. 109.

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 109. Specifically, the ALJ determined that Plaintiff did not meet the criteria under Medical Listings 1.04 (disorders of the spine), 4.00H1 (evaluating hypertension), 4.02 (chronic heart failure), and 6.02 (impairment of renal function).  Tr. 109.  The ALJ also noted that "[n]o medical expert has concluded that the claimant's impairments meet or equal a listed impairment."  *Id.*

4. "[T]he claimant has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can lift/carry 10 pounds frequently and 20 pounds occasionally. She can frequently use her hands for simple grasping, fine manipulation, and pushing and pulling of arm controls. She can occasionally use her feet for the pushing and pulling of leg controls. She can occasionally stoop, crouch, kneel, crawl, balance, and reach overhead. She can occasionally climb ladders, ropes, and scaffolds. She can frequently climb ramps and stairs. She can occasionally work around unprotected heights, be around moving machinery, and drive automotive equipment. She can tolerate occasional exposure to marked changes in temperature and humidity. She experiences a moderate degree of pain which occasionally interferes with concentration, persistence, and pace, but does not require her to abandon her work or work station. This is not a continuous concept and occurs intermittently."
Tr. 109.

5. "The claimant is capable of performing past relevant work as a housekeeper (as actually performed). This work does not require the performance of work-related activities precluded by the claimant's [RFC]." Tr. 49-50, 116. The ALJ noted that the VE testified that Plaintiff has past work as a housekeeper, home, with a <u>Dictionary of Occupational Titles</u> number 301.474-010, semi-skilled work with and SVP of 3, medium exertion as defined, but light exertion as performed.[4] Tr. 116.

---

[4] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi[skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment , property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. § 404.1568(b). An SVP of 3 means "[o]ver 1 month up to and including 3 months." <u>Dictionary of Occupational Titles</u> (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. In

6. The ALJ determined at step five that Plaintiff was capable of performing other jobs existing in the national economy. Tr. 51, 117-18. "The claimant has a limited education [completed the eleventh grade] and is able to communicate in English." *Id.* "[C]onsidering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform" such as hostess, companion, and general office clerk, all at light exertion level, semi-skilled, with an SVP of 3. Tr. 118. The ALJ determined that the VE's testimony was consistent with the information contained in the DOT. *Id.*

7. "The claimant has not been under a disability, as defined in the [Act], from July 24, 2012," through the date of the ALJ's decision. Tr. 118.

## III. Medical and Other Evidence

### A. Background Information

Plaintiff was born in March 1960, making her 52 years old at her alleged onset date of July 24, 2012, and 55 years old at the date of the Commissioner's final 2015 decision. Tr. 57. Plaintiff completed the eleventh grade and worked for the same company as a housekeeper and cook from 1981 through July 24, 2012. Tr. 18, 231-34, 261. On June 16,

---

part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds. . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time" 20 C.F.R. § 404.1567(b).

2014, Plaintiff's former manager noted she was hired to babysit for a holiday event, but "was unable to perform her duties as babysitter due to her ongoing back problems."  Tr. 306.

## B.  Relevant Medical Evidence

*Fred Rosenblum, M.D.*

A January 22, 2003, pulmonary function test (PFT) was performed due to a diagnosis of pulmonary hypertension with dyspnea (shortness of breath) after walking less than 100 yards, productive cough, frequent wheezing, and a pack-a-day of cigarette smoking history for 24 years. Tr. 434.  Plaintiff's height was 67 inches. *Id.*  The test comments were that Plaintiff "demonstrated excellent cooperation, effort, and coordination" and stated the medications provided for the post-bronchodilator test (alupent and saline).  Tr. 434.  The PFT results were:

|  | Pre-Medication | Post-Medication |
|---|---|---|
| FVC | 1.34 (43% of predicted) | 1.40 (45% of predicted) |
| FEV1 | 1.22 (47% of predicted) | 1.27 (49% of predicted) |

*Id.* In a "preliminary report," Dr. Rosenblum provided his interpretation.

Severe restriction.  No change with bronchodilator treatment.

Lung volumes show some air trapping, suggesting an obstructive component to the deficit.

Diffusion capacity only mildly reduced.

Room-air blood gas shows C02 [carbon dioxide] retention an[d] hypoxia consistent with the obesity hypoventilation syn[d]rome.

Tr. 432-33; *see* Tr. 110.

On February 11, 2003, Dr. Rosenblum noted that Plaintiff was found to have pulmonary hypertension by echocardiography with a pulmonary artery pressure of 71 and blood gasses showing significant LVC hypoventilation.  Tr. 438; *see* Tr. 110.  A sleep study indicated sleep efficiency of 37% with 128 hypopneas associated with oxygen desaturations to as low as 80% and inability to reach REM sleep.  *Id.*  After a CPAP was implemented, however, Plaintiff showed good response, but still "did require supplemental oxygen to help maintain her saturation."  *Id.* Dr. Rosenblum prescribed nightly use of CPAP with cool humidity and one liter of supplemental oxygen.  *Id.*

*James T. Brown, M.D.*

On January 4, 2010, Dr. Brown noted Plaintiff "smokes less than a half a pack a day."  Her lungs were clear and he encouraged her to stop

smoking.  Tr. 311.  On May 21, 2010, Dr. Brown noted that Plaintiff had "[n]o shortness of breath" and her lungs were "[c]lear bilaterally."  Tr. 309. He encouraged Plaintiff to stop smoking.  Tr. 312.

On January 28, 2011, Plaintiff reported dyspnea when walking approximately 50 feet.  Tr. 307; *see* Tr. 111.  She denied chest pain.  She smoked daily.  She also reported chronic back pain for the past 10 to 11 years that was not alleviated by chiropractic treatment.[5]  Plaintiff declined an MRI for the evaluation of back pain.  Tr. 308.  Combivent was provided for "restrictive lung disease."  She was advised to stop smoking, and instructed to take Toprol and Clonidine for Hypertension.  *Id.*  PFT testing results, with the best of five attempts were: FVC 1.36 (40% of predicted) and FEV1 1.22 (42% of predicted).  Tr. 315-16.  The PFT report stated a height of 171 cm (67.3 inches).  Tr. 315.  Treatment notes indicate a height of 66 inches.  Tr. 307, 309, 311.  Dr. Brown opined that these results indicated a "baseline severe restriction."  Tr. 308, 315*; see* Tr. 111.  She

---

[5]  Plaintiff received treatment from John Dunn, D.C., in eight sessions from August to October 2010, reporting that her longstanding back pain was "now starting to [a]ffect my walking and standing."  Tr. 320-35.  She was noted to exhibit muscle spasm and was diagnosed with sciatica, lumbalgia, and cervicalgia.  Tr. 331-35; *see* Tr. 111.

was diagnosed with back pain, but declined an MRI; encouraged to stop

smoking; dyspnea; hypertension; and medical non-compliance.

Tr. 308; *see* Tr. 111.

On February 17, 2012, Plaintiff reported recurrent back pain radiating

into her legs.  Tr. 346.  She had reduced her smoking to one or two

cigarettes daily, and was taking Tylenol and ibuprofen for moderate

paralumbar pain, but had no pain at the examination.  Tr. 346-47.

Medications for hypertension were prescribed, and MRI was ordered for

assessment of back pain, and laboratory testing indicated a moderately

decreased Glomerular Filtration Rate (GFR) of 40.60, classified as stage

three kidney damage.  Tr. 347, 356.

On July 13, 2012, Plaintiff reported her over-the-counter medication

was no longer helping her back pain and she needed something stronger.

Tr. 340.  She informed Dr. Brown that she quit smoking in May 2012.  *Id.*

Her pain level was still listed at zero, but Dr. Brown noted paraspinal

muscle tenderness bilaterally upon examination.  Tr. 341.  A review of

systems indicated no chest pain or "dyspnea (shortness of breath)."  *Id.*

Dr. Brown diagnosed hypertension, chronic pain syndrome, degenerative disc disease, and instructed Plaintiff to take Norco instead of Tylenol and ibuprofen.  *Id.*  In laboratory testing the following day, Plaintiff's GFR was 37.95, indicating worsening, but still classified as stage three kidney damage (range of 30-59).  Tr. 351-52.  Plaintiff returned to Dr. Brown on August 1, 2012, reporting that she continued to have chronic lower back pain with knee and joint pain and was taking Norco, but it made her sleepy. Tr. 338.  She had no dyspnea.  *Id.*  The examination again confirmed mild bilateral muscle tenderness and Plaintiff was instructed to continue taking Norco, in addition to her blood pressure medications.  *Id.*  She abstained from smoking.  Tr. 337.

On January 18, 2013, Dr. Brown noted ongoing paraspinal muscle tenderness bilaterally and provided a refill of Norco for pain.  Tr. 409-10. Plaintiff's hypertension medications were changed, and she abstained from smoking.  *Id.*  On July 26, 2013, Dr. Brown saw Plaintiff for a cough and head/chest congestion with "wheezing and mild dyspnea for 1 week." Tr. 406-07.  She had "good air movement."  Tr. 407.  He noted that Plaintiff was still taking Norco, over-the-counter cough medication, and her

hypertension medications.  Dr. Brown also prescribed an Albuterol inhaler to use four times daily ("qid") with a short course of steroids and antibiotics for "probable [chronic obstructive pulmonary disease (COPD) exacerbation" and noted that her symptoms improved with nebulized albuterol treatment in-office and she was still abstaining from smoking.  Tr. 373-82, 407.  She was already being prescribed cough syrup, which was continued, but she refused a screening X-ray for pneumonia. Tr. 374-75, 407.

On November 20, 2013, Plaintiff continued to abstain from smoking, but was still taking Norco for pain, Albuterol inhaler four times daily, and a course of steroids.  Tr. 387-88.  Dr. Brown noted that Plaintiff had lost 31 pounds and was concerned that she was "underweight."  Tr. 388. Respiratory examination showed "clear to auscultation bilaterally."  *Id.*

On December 23, 2013, Dr. Brown noted that Plaintiff continued taking both her Albuterol inhaler four times daily and her hypertension medication.  Tr. 384.  She abstained from smoking.  *Id.*  A review of systems indicated Plaintiff had a persistent cough.  Tr. 385.  The diagnoses were hypertension, cardiomegaly and cough, but Plaintiff declined Dr. Brown's recommendation that she get an updated PFT due to her cough

and an echocardiogram due to her cardiomegaly.  Tr. 385.  (A May 2003

chest X-ray revealed cardiomegaly without decompensation.

Tr. 446.)  There is no indication in this patient record that Plaintiff declined

to have these tests due to financial reasons.[6]  Tr. 385-86.  Dr. Brown also

noted that he would not complete "disability paperwork" and recommended

that her attorney "send her to [a doctor] that does disability."  Tr. 386; *see*

Tr. 49.

On June 4, 2014, Plaintiff was involuntarily admitted to Tallahassee

Memorial Behavioral Health Center after leaving Dr. Brown's office after

expressing "some vague and nonspecific thoughts about suicide" which

she attributed to her chronic pain issues and overall "wonder[ing] if life is

---

[6]  In her memorandum, Plaintiff states: "She was unable to get an updated PFT, or other medical necessary testing, earlier due to a lack of funds and insurance. (R. 385)."  ECF No. 16 at 23.  As noted, there is no mention on page 385 that Plaintiff declined these tests due to inability to pay or lack of insurance.  Plaintiff also refers to her testimony, ECF No. 16 at 23, where she was asked by the ALJ whether she had been treated for problems with her left knee and back and replied: "No, Judge, because I have not had the money nor insurance to go to a doctor for these complaints that are getting worse."  Tr. 20.  Plaintiff also testified that she returned her CPAP "machine back in 2013" because she could not afford it.  Tr. 22.  This testimony was made in the context of the ALJ inquiring of whether there were any records supporting her testimony regarding having an impairment due in part to sleep apnea.  Tr. 22-28.  After the hearing, records were provided to the ALJ pertaining to PFT testing results from 2003, *see* Tr. 430-46 (Exhibit 13), which were considered by the ALJ.  Tr. 110.  Plaintiff quit smoking in May 2012, Tr. 340, and Dr. Crenshaw noted in January 2014, that Plaintiff denied any chest discomfort or shortness of breath, Tr. 414, a fact noted by the ALJ, Tr. 113.

worth going on living." Tr. 395. Dr. Brown's statement in support of the

involuntary admission was that Plaintiff "mentioned that she felt suicidal

and would overdose on her medications as a means to this end." Tr. 397.

Plaintiff later denied, however, any suicidal ideation and the examining

psychiatrist felt that Plaintiff was "misunderstood, and was discharged to

her home." Tr. 395. She was discharged with diagnoses of an unspecified

adjustment reaction and unspecified anxiety state. Tr. 394. Plaintiff

received a Global Assessment of Functioning (GAF) score of 50 upon

discharge. Tr. 395.

*Daryl O. Crenshaw. M.D.*

On November 25, 2013, Plaintiff first saw nephrologist Dr. Crenshaw

upon referral by Dr. Brown due to renal insufficiency with creatinine of 4.0

mg/dL and markedly elevated blood urea nitrogen (BUN) level of 63.

Tr. 425. Upon examination, Dr. Crenshaw noted symptoms of decreased

appetite, cough and shortness of breath with exertion (despite abstaining

from smoking), nocturia and nighttime urinary frequency, and back and

lower extremity pain. Tr. 423, 427. Her lungs were clear with no

adventitious breath sounds. Tr. 427. Dr. Crenshaw's impression was

chronic kidney disease with additional differential diagnosis of (a)

hypertension, versus (b) renal artery stenosis, versus (c) obstructive renal

disease, versus (d) cystic renal disease, versus (e) myeloma kidney

disease, versus (f) interstitial nephritis secondary to NSAID use.  Tr. 425.

Dr. Crenshaw found it notable that "she has not seen a nephrologist in the

past, despite a serum creatinine of 4.0 mg/dL" and instructed Plaintiff to

discontinue using NSAIDs, obtain further testing, and reduce her blood

pressure.  *Id.*  A renal ultrasound identified only slightly small kidneys

bilaterally.  Tr. 440.  It was noted that Plaintiff had a prior diagnosis of sleep

apnea, but did not sleep with a CPAP.  Tr. 425-26.

On December 2, 2013, Dr. Crenshaw saw Plaintiff in follow-up for her

Chronic Kidney Disease Stage III in the setting of Hypertension.

Tr. 419-21.  Dr. Crenshaw noted he discussed tobacco cessation with

Plaintiff.  Tr. 419.  Upon examination, Plaintiff's symptoms included a cough

and decreased appetite although both were "better," shortness of breath,

and back and lower extremity pain.  Tr. 420.  Her serum creatinine had

improved and returned to levels of 2.6 mg/dL.  Tr. 419.  She was alert and

oriented.  Tr. 420.

On January 22, 2014, Plaintiff followed-up with Dr. Crenshaw for

Chronic Kidney Disease Stage III in the setting of Hypertension.  Tr. 414.

Plaintiff "denie[d] any chest discomfort or shortness of breath.  No

complaitns [sic] in office."[7]  *Id.*  Plaintiff's past medical history included

chronic bronchitis.  She also still reported back and lower extremity pain

and was noted to have ongoing Chronic Kidney Disease Stage III with

hypertension, for which a kidney biopsy was recommended.  Tr. 415-17.

Plaintiff did not sleep with a CPAP.  Tr. 414.  A review of systems for

pulmonary functions was negative and her lungs were clear.  Tr. 415.

Dr. Crenshaw's impressions included Chronic Kidney Disease Stage III,

Hypertension, Protinuria, and Tobaccoism.  Tr. 416.  The plan included:

"For Tobaccoism – consider tobacco cessation and limit alcohol intake."

Tr. 417.

---

[7]  The ALJ noted: "I give significant weight to the records of Dr. Crenshaw, which indicate that as recently as January 2014 the claimant raised no complaints and she denied any chest discomfort or shortness of breath (Exhibit 12F).  Dr. Crenshaw was the claimant's treating nephrologist.  His records are well-developed by his own clinical examinations and testing, as discussed above, and are generally consistent with the record as a whole.  Furthermore, pursuant to 20 CFR 404.1527(d)(5) and 416.927(d)(5), we generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  Tr. 113.

On June 10, 2016, Plaintiff filed her memorandum with this Court.

ECF No. 16.  Plaintiff attached several documents from Archbold Medical

Center pertain to December 29, 2015, pulmonary function lab results.  ECF

No. 16-1 (Exhibit A).  Dr. Crenshaw referred Plaintiff for this "full study"

performed by Craig E. Wolff, M.D.  *Id.*  Dr. Wolff noted his interpretation

and conclusion.

> INTERPRETATION:
> The FVC and FEV1 [Spirometry] are moderately reduced with a
> normal FEV1/PC ratio. No change occurs in the FEV1 after inhaled
> bronchodilators [bronch].  The MVV is low [Spirometry].  TLC is
> moderately reduced [Lung Volumes].  The ERV is very low [Lung
> Volumes].  DLCO is severely reduced with a low DLCO/VA ratio,
> which could represent loss of whole lung units [Diffusion].  The flow
> volume curve is unremarkable except for low volumes.  Room air
> arterial blood gas shows a compensated metabolic alkalosis with a
> reduced p02.  The hemoglobin is slightly reduced to 11.6.
>
> CONCLUSION:
> Mild-to-moderate restrictive lung disease.  Some additional restriction
> due to obesity may be present as well.

ECF No. 16-1 at 1.  In a separate report, it is noted: "SOB [shortness of

breath] Pre-Op for transplant."  EXF No. 16-1 at 3.  It is also noted:

"Dyspnea: Walking less than 100 yards[;] Cough: Productive[;] Wheeze: No

Wheeze[;] Tbco Prod: Cigarette[;] Yrs Smk: 8.0[;] Pks/Day: 0.5[;] *Yrs Quit:*

*0.6."*  *Id.*  (emphasis added).  (As noted herein, Plaintiff had quit smoking

cigarettes in May 2012.  Tr. 340.  Except for the notation above (Tbco Prod:

Cigarette Yrs Smk: 8.0 Pks/Day: 0.5 *Yrs Quit: 0.6),* the record is silent

regarding whether Plaintiff began smoking again after the record closed

and the ALJ's decision in August 2014.)  Medications included use of a

"CPAP @ HS 2 1pm."  *Id.*  Post-test comments included good patient effort

and cooperation.  *Id.*  Spirometry results are included.

|      | Pre-bronch | Post-bronch |
|------|------------|-------------|
| FVC  | 1.44 (49% of predicted) | 1.38 (47% of predicted) |
| FEV1 | 1.16 (50% of predicted) | 1.17 (50% of predicted) |

ECF No. 16-1 at 3; *see supra* at 8-9 for 2003 and 2011 PFT results.  Plaintiff

argues that these test results justify a sentence six remand in light of other

evidence of record.  ECF No. 16 at 22-25.

*Consultative Examination – Wayne Sampson, M.D.*

On September 18, 2012, Dr. Sampson examined Plaintiff at the

Commissioner's request.  Tr. 359-66.  Plaintiff reported constant low back

pain now radiating into her legs with a pain level of 5/10 "most of the time."

Tr. 359.  She also reported numbness of the right thigh.  *Id.*  Her pain

worsened with activities such as bending over, stooping, squatting, and

carrying anything over 20 pounds for more than 20 yards.  *Id.*  When

walking, her legs felt weak and she could not walk far or stand for long, for example, she had to lean over her sink to wash dishes for four to five minutes. *Id*. She was taking hydrocodone for pain and blood pressure medications, and was not smoking. *Id*. She denied chronic, non-refreshed sleep. *Id*. Although Plaintiff had been prescribed a CPAP, she stated she could not afford it, but her sleep apnea symptoms "improved" with weight loss. Tr. 360. She denied "chest pain, dyspnea, or orthopnea, palpitations, or PND." *Id*. (Plaintiff had stopped smoking cigarettes in May 2012 having previously smoked a pack a day for 24 years. Tr. 340, 434.) Upon examination, Dr. Sampson noted pain only with range of motion of the left shoulder. No tenderness or spasms or leg atrophy was noted for her thighs and legs. Tr. 360. Examination of her chest revealed no chest wall deformity and examination of her lungs revealed that they were clear and with good air entry. *Id*. Her motor strength was 5/5 throughout, including hand grip. *Id*. Her gait was normal and she was able to stand and walk of her heels and toes. *Id*. She was able to get up from a seated position and on and off the exam table without difficulty. *Id*. SLR examination was negative while supine and sitting. *Id*. Plaintiff had normal range of motion

in all areas tested.  Tr. 362-63.  Dr. Sampson diagnosed chronic back pain
– history of degenerative disease of the lumbar spine; history of obstructive
sleep apnea – stable; and hypertension.[8]  Tr. 361.

*Non-Examining Medical Source Opinions*

On January 11, 2013, non-examining physician Sunita Patel, M.D.,
opined on reconsideration that Plaintiff was capable of medium exertional
activity.  Tr. 84-85.  Dr. Patel noted that her opinion was based on Plaintiff's
"back pain, cervicalgia," Tr. 85-86, and that her medically determinable
impairment was reasonably expected to produce the pain and other
symptoms, and her statements about the intensity, persistence, and
functionally limiting effects of the symptoms were substantiated by the
medical evidence alone.  Tr. 84.  The ALJ gave Dr. Patel's opinion
"moderate weight," although he determined that Plaintiff was "more limited
than determined by Dr. Patel."  Tr. 114.

## C. Testimony

*Plaintiff's Pre-Hearing Statements*

---

[8]  The ALJ considered Dr. Sampson's report and gave "significant weight to
Dr. Sampson's physical assessment."  The ALJ noted that Dr. Sampson was an Agency
examining physician, not a treating physician.  Tr. 113-14.

In September 2012, Plaintiff completed a questionnaire for the Commissioner regarding her activities and limitations.  Tr. 269-76.  She reported being able to cook daily, but for one hour at most and alternating between sitting and standing.  Tr. 271.  Household chores also took her all day due to stopping and taking breaks, and she noted she did not feel up to doing chores "[b]ut because I live alone I have to do it."  *Id.*  She shopped once a month, goes outside to sit on her porch, water flowers, or would "try and take short walks", and would also play cards or had a guest over "every now and then" and went to church "sometimes."  Tr. 272-73.  However, she did not go anywhere that she would need to "walk a long way or go up stairs" and wanted a cane.  Tr. 274-75.  At that time, she was taking Hydrocodone with Acetaminophen twice daily, which made her sleepy.  Tr. 277.

In December 2012, Plaintiff informed the Commissioner that she was having more difficulty walking and breathing and considered buying a cane.  Tr. 295.  Medications including Tylenol and Advil made her "a little comfortable for a while so that I can do my housework," although she sometimes had to sit to prepare food and leaned on a cart when shopping.

Tr. 296.  Her only activity was playing cards.  She had to call someone for any house maintenance needs, and she would sit/stand/walk "off and on all day."  Tr. 297.

*Plaintiff's Testimony*

At the February hearing, Plaintiff testified that she worked for the same company as a housekeeper and cook from 1981 through July 24, 2012, her last day of work.  Tr. 18-19.  The job was performed mainly standing and the maximum weight lifted was 30 pounds.  Tr. 19.  (In a form previously completed, Plaintiff noted the maximum weight was 20 pounds. Tr. 247, 256, 262.).  She received a payout of her set-aside wages in late 2012 in the amount of $4,449.00.  Tr. 19-20.

Plaintiff testified that she was unable to receive medical treatment for her knees, "especially in my left knee," which "gives out sometime," and her back "because I have not had the money nor insurance to go to a doctor for these complaints that are getting worse."  Tr. 20.  She had been diagnosed by a doctor for sleep apnea and degenerative disc disease by Dr. Rosenberg in Thomasville, Georgia, in 2006.  She previously used a CPAP machine, "but I could no longer keep it because I couldn't afford it.

So I had to turn it back in" in 2013.  Tr. 22.  A lengthy discussion between the ALJ and Plaintiff's counsel ensued.  Tr.  22-28.[9]  Thereafter, the ALJ inquired of Plaintiff.  Tr. 28.

She was only taking medications for hypertension at the time of the hearing and no narcotic pain medications.  Tr. 30-31.  Regarding her back pain, if she moved such as to sit, stand, bend or lift, she experienced sudden pain of 8/10 in intensity.  Tr. 29-30.  The pain at level 8 "doesn't last long," "maybe a minute with those nerves," and occurs every day.  Tr. 30.

Plaintiff usually uses her right hand.  Tr. 31.  She reported occasional tingling in her hands and "they get like numb."  *Id.*  She can grip things like a knife, fork, pen and pencil, and a microphone.  *Id.*  She can feel her fingers.  Tr. 32.

Regarding other limitations, Plaintiff testified that she could lift a gallon of milk using both hands or up to 10 pounds, stand two minutes at a time before having to sit down and up to two hours total in a workday

---

[9]  At the end of the hearing, the ALJ agreed to keep the record open for two weeks.  Tr. 54-55.  Additional records were filed after the hearing and before the ALJ entered his decision.  The records were considered by the ALJ.  Tr. 110, 430-46 (Exhibit 13F).  These records pertain to a pulmonary function test for 2003.  *Id.*; *see supra* at 7-9.

because "I do a lot of. . .sitting because it's not comfortable for me to stand." Tr. 32-33, 35. Plaintiff could sit for up to an hour at a time if she could "keep moving around" and a total of eight hours in a workday. Tr. 33-34, 39-40. She could walk "probably about five minutes" but "it would take me some time… to walk in a period of eight hours….Maybe an hour" in a workday total. Tr. 34. Plaintiff required a cane to walk, including inside her house. Tr. 38.

In a typical day, Plaintiff had difficulty getting out of bed and might stay in bed due to discomfort. Tr. 35. She usually watched television in a recliner chair in her bedroom because elevating her legs was more comfortable than lying down or sitting in a regular chair. Tr. 35-36, 38-39. After lunch, she watched more television, but in the living room. Tr. 36. She may "walk out around in my house or go and sit out on the porch." *Id*. Plaintiff also took naps during the day for about an hour. Tr. 41. She did "[v]ery light cooking" for dinner, and would watch more television or read the bible before going to sleep, in all 12 hours of television watching. Tr. 36-37. She did a "little mopping, not much," while using her cane if she could do so intermittently, but her niece vacuumed for her. Tr. 37, 40-41.

She shopped, made her bed, went to church twice a month, and would sometimes go visiting, but did no yard work or gardening.  Tr. 37-38.  However, on a bad day she did no activities and she had "more bad days than good days… Per week I would say two or three good days…. It just varies."  Tr. 43.

   *Vocational Witness Testimony*

   At the hearing, Ms. Jarrell testified that Plaintiff's past relevant work was: "housekeeper, home, because that's the cook and the cleaner, the DOT is 301.474.010, medium, with an SVP of 3, that's semi-skilled."  Tr. 46; *see supra* at 5-6 n. 3.  Ms. Jarrell noted that the job is generally performed, per the DOT, at the medium exertional level, but it was actually performed by the Plaintiff at the light exertional level.  Tr. 47.

   The ALJ asked Ms. Jarrell to "identify the semi-skills [sic] or skills acquired by the claimant in the past 15-years" to which Ms. Jarrell responded: "it semi-skilled, there is not."  Tr. 47.  The ALJ asked again, "Well, what's semi-skills [sic] did she acquire in the last 15-year.?" and Ms. Jarrell responded, "[t]he semi-skills [sic] where she was able to maintain a household by cleaning it and preparing breakfast, lunch and

dinner.  So cooking and cleaning." *Id.*  When the ALJ asked Ms. Jarrell,

"[a]re any of these skills easily transferable to other work?," Ms. Jarrell

stated they were not.  *Id.*

The ALJ then asked Ms. Jarrell a series of hypothetical questions.

Tr. 48-51.  First, if the Plaintiff's testimony were fully credited, no jobs could

be performed.  Tr. 48.  Second, the ALJ presented a hypothetical question

identical to the ultimate RFC finding.  Tr. 49-50, 109 (RFC assessment).

Ms. Jarrell stated that the Plaintiff's past relevant work, as it was actually

performed at the light exertional level, could be "as performed but not per

the DOT."  Tr. 50.

Ms. Jarrell testified that other light, semi-skilled (SVP 3) jobs could

also be performed: hostess (DOT 352.667-010); companion (DOT 309.677-

010); and general office clerk (DOT 209.562-010).  Tr. 50-51; *see* 117-18;

*also supra* at 5-6 n.3.

Ms. Jarrell was provided with the same hypothetical with an additional

element that the hypothetical individual experiences a moderately severe

degree of pain which interferes with concentration, persistence and pace

for one minute at a time and occurs occasionally throughout the day and

does not require the hypothetical individual to abandon the workstation for that period of time.  Tr. 51.  Ms. Jarrell testified that this would not affect her prior responses.  *Id.*

When asked if use of a cane while standing or walking would interfere with the "ability to perform the jobs that you mentioned?"  Ms. Jarrell stated "No, not like if it's a host or a hostess or companion.  No, I would say no."  Tr. 51-52.  Finally, if the individual were limited to standing a total of two hours in an eight-hour workday, Ms. Jarrell stated that "[j]ust the companion.  Well, the office worker too" jobs could be performed even though they were classified as light exertional activity.  Tr. 52.

## IV.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

<u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The
Commissioner's factual findings are conclusive if supported by substantial
evidence."  <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002)
(citations omitted).  The court may not reweigh the evidence or substitute
its own judgment for that of the ALJ even if it finds that the evidence
preponderates against the ALJ's decision.  <u>Moore</u>, 405 F.3d at 1211.[10]

"In making an initial determination of disability, the examiner must
consider four factors: '(1) objective medical facts or clinical findings; (2)
diagnosis of examining physicians; (3) subjective evidence of pain and
disability as testified to by the claimant and corroborated by [other
observers, including family members], and (4) the claimant's age,
education, and work history.'"  <u>Bloodsworth</u>, 703 F.2d at 1240 (citations

---

[10]  "If the Commissioner's decision is supported by substantial evidence we must
affirm, even if the proof preponderates against it."  <u>Phillips v. Barnhart</u>, 357 F.3d 1232,
1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard,
however, does not permit a court to uphold the Secretary's decision by referring only to
those parts of the record which support the ALJ.  A reviewing court must view the entire
record and take account of evidence in the record which detracts from the evidence
relied on by the ALJ."  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).
"Unless the Secretary has analyzed all evidence and has sufficiently explained the
weight he has given to obviously probative exhibits, to say that his decision is supported
by substantial evidence approaches an abdication of the court's 'duty to scrutinize the
record as a whole to determine whether the conclusions reached are rational.'"  <u>Cowart
v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[11]  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of

---

[11]  The relevant DIB and SSI regulations are virtually identical.  As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise.  The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz

Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R.

§ 404.1520(a)(4)(i)-(v).

1.     Is the individual currently engaged in substantial gainful
activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that
meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404,
Subpart P?

4.     Does the individual have the RFC to perform work despite
limitations and are there any impairments which prevent past
relevant work?[12]

5.     Do the individual's impairments prevent other work?

---

[12]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R.
§ 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including
the claimant's description of her limitations, observations by treating and examining
physicians or other persons, and medical records.  *Id.*  The responsibility for
determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c); *see* Social
Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term
"*residual functional capacity assessment*" describes an adjudicator's finding about the
ability of an individual to perform work-related activities.  The assessment is based upon
consideration of all relevant evidence in the case record, including medical evidence
and relevant nonmedical evidence, such as observations of lay witnesses of an
individual's apparent symptomatology, an individual's own statement of what he or she
is able or unable to do, and many other factors that could help the adjudicator determine
the most reasonable findings in light of all the evidence.").

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  An ALJ may make this determination either by applying the grids or by obtaining the testimony of a vocational expert.  Phillips, 357 F.3d at 1239-40; *see* 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform

the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007,

1011 (11th Cir. 1987).

## V.  Legal Analysis

### A.  ALJ's Consideration of Plaintiff's Proof of Listing

Plaintiff argues the ALJ erred in not finding that Plaintiff's alleged

impairment of chronic pulmonary insufficiency did not meet or equal Listing

3.02.  ECF No. 16 at 17-22; *see supra* at 5, ¶ 3.  Plaintiff also argues that

the ALJ erred because he did not specifically discuss whether Plaintiff's

impairments met or equaled Listing 3.02.  *Id.*

The third-step of the five-step process requires the ALJ to compare

the claimant's medical evidence to a list of impairments "presumed severe

enough to preclude any gainful work."  Sullivan v. Zebley, 493 U.S. 521,

525 (1990).  If the medical evidence meets or equals the listing, then a

finding of disability is made.  *Id.*  The claimant's impairments must meet or

equal *all* of the specified medical criteria in a particular listing for the

claimant to be found disabled at step three of the sequential evaluation

process.  *Id.* at 530-31.

The burden is on the claimant to prove that she is disabled.  Moore,

405 F.3d at 121; Bell v. Bowen, 796 F.2d 1350, 1352 (11th Cir. 1986)

(citing 20 C.F.R. §§ 404.1525, 404.1526); Wilkinson v. Bowen, 847 F.2d

660, 663 (11th Cir. 1987); *see* 20 C.F.R. § 404.1512(a).   To meet a listing,

the claimant must show she has been (1) diagnosed with a condition

included in the listings and (2) present specific medical findings that meet

the various tests listed under the description of the applicable impairment.

Bell, 796 F.2d at 1353.   A diagnosis alone is insufficient.   20 C.F.R.

§ 404.1525(d) ("To meet the requirements of the listing, you must have a

medically determinable impairment(s) that satisfies all of the criteria of the

listing.").   Nevertheless, if the claimant has been diagnosed with a condition

described in the listings, but is unable to provide medical evidence that

meets all the criteria, she may still qualify for the particular listing if there

are other findings related to the impairment(s) that are at least of equal

medical significance to the required criteria.   Wilkinson, 847 F.2d at 662; 20

C.F.R. § 404.1526(b).

        The ALJ does not need to "mechanically recite the evidence" leading

to the determination that the claimant's impairments do not meet the listing

criteria.   Hutchinson v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986).   In

other words, the ALJ's listing determination need not be explicitly stated, but may be found implicitly in the ALJ's decision, even if the ALJ goes to the fourth and fifth steps of the disability analysis, *id.*, as here.

To meet Listing 3.02, Plaintiff must show pulmonary insufficiency and meet or equal the criteria.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02.  Listing 3.02A provides: "Chronic obstructive pulmonary disease, due to any cause, with the $FEV_1$ equal to or less than" 1.35 for a person between 66 and 67 inches tall.  Listing 3.02B provides: "Chronic restrictive ventilatory disease, due to any cause, with the FVC equal to or less than" 1.55 for a person between 66 and 67 inches tall.  Plaintiff's height was between 66 or 67.3 inches.  Tr. 307, 309, 311, 315.

In 2003, Plaintiff's pre-medication FVC score was 1.34 and her $FEV_1$ score was 1.22.  Tr. 432-33.  After medication, her FVC score increased to 1.40 and her $FEV_1$ score increased to 1.27.  *Id.*  Dr. Rosenberg opined that the scores indicated a severe restriction.  Tr. 432-38.  The 2003 testing does not meet all the requirements for acceptable spirometry under section 3.00E, *e.g.*, the 2003 testing produced one $FEV_1$ value and one FVC value, whereas section 3.00E requires at least three satisfactory forced expiratory

maneuvers.  Tr. 434; *see* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 3.00E ("The

reported one-second forced expiratory volume ($FEV_1$) and forced vital

capacity (FVC) should represent the largest of at least three satisfactory

forced expiratory maneuvers.  Two of the satisfactory spirograms should be

reproducible for both pre-bronchodilator tests and, if indicated, post-

bronchodilator tests.").

In 2011, Plaintiff's best of five attempts were an FVC score of 1.36

and an $FEV_1$ score of 1.22.  Tr. 315-16.  The predicted percentages for

both scores were 40 and 42 percent, respectively.  Tr. 315.  Dr. Rosenberg

opined that the scores indicated a severe restriction.  Tr. 308, 315.  The

evidence did not indicate that the test results satisfy the relevant criteria.

"Spirometry should be repeated after administration of and aerosolized

bronchodilator under supervision of the testing personnel if the pre-

bronchodilator $FEV_1$ value is less than 70 percent of the predicted normal

value."  20 C.F.R. Pt. 404, Subpt. P, App.1, § 3.00E.  The 2011 spirometry

tests do not include post-bronchodilator results.  Tr. 315.

At the time of the 2003 tests, Plaintiff had been smoking a pack of

cigarettes daily for 24 years.  Tr. 434.  As of the 2011 tests, Plaintiff

smoked daily, but less than a pack a day, Tr. 307.[13]  Tr. 111.  It was not until May 2012 that Plaintiff stated she stopped smoking cigarettes.

On December 2, 2013, Dr. Crenshaw noted that Plaintiff denied any chest discomfort, but stated she had shortness of breath, but no complaints in the office.  Dr. Crenshaw also "discussed tobacco cessation with her today." Tr. 419.  A pulmonary review of systems indicated a cough, short of breath, but her cough was better.  Tr. 420.  A physical examination indicated that Plaintiff's lungs were clear and no adventitious breath sounds present.  *Id.* (In December 2013, Plaintiff declined Dr. Brown's offer of a PFT.  Tr. 112.)  By January 2014, Dr. Crenshaw noted that Plaintiff raised no complaints and she denied any chest discomfort or shortness of breath. Tr. 113, 414; *see supra* at 3-4 n.3.  A pulmonary review of systems was negative and her lungs were clear.  Tr. 415.  One of Dr. Crenshaw's impressions included "Tobaccoism" and his plan included "consider tobacco cessation and limit alcohol intake."  Tr. 416-17.

As noted in disability reports and other documents, Plaintiff alleged

---

13  *See* Holley v. Chater, 931 F. Supp. 840, 847-48 (S.D. Fla. 1996) ("[T]he continued use of cigarettes by plaintiff suggests that his pulmonary condition is not as severe as he alleges and further supports the ALJ's decision to accord [plaintiff's] subjective complaints diminished weight.").

she was disabled, in part, due to sleep apnea and shortness of breath.

Tr. 57, 66, 79, 89, 254, 288.  During the hearing, the ALJ asked Plaintiff to

describe the nature of any diagnoses by a doctor.  Tr. 21.  Relevant here,

Plaintiff said that Dr. Rosenberg diagnosed her with "sleep apnea."  *Id.*  (A

sleep study was performed in 2003.  Tr. 110 (Exhibit 13F).)  Plaintiff stated

that she had an overnight sleep apnea test.  *Id.*  When asked if she had a

second sleep apnea test with a CPAP, she said had to return the CPAP in

2013 because she "couldn't afford it."  Tr. 21-22.

The ALJ asked Plaintiff's counsel if there were any medical records

indicating a diagnosis for sleep apnea because he had "no knowledge of

this, no evidence of this, and no ability to evaluate the severity of the sleep

apnea"  Tr. 22.  A lengthy discussion regarding the lack of medical records

pertaining to this issue ensued.  Tr. 22-28.  At the time of the hearing, the

record included medical records related to Plaintiff's claim of sleep apnea

and dyspnea, although some of the records, especially after May 2012

when she stopped smoking, were not favorable to Plaintiff.  *See, e.g.,*

Tr. 307-08, 338, 341, 350, 360, 406-07, 409-10.  In fairness to Plaintiff, the

ALJ held the record open for two weeks to allow Plaintiff's counsel "to

obtain some additional medical records."  Tr. 55.

After the hearing, the ALJ was provided with approximately 16 pages

of records from Archbold Medical Hospital from September 25, 2002, to

November 25, 2013.  Tr. 430-46 (Exhibit 13F).  The ALJ discussed these

records pertaining to Plaintiff's alleged pulmonary impairment that are

interspersed with his consideration of other medical records.

> Turning to the medical evidence, the objective findings in this case
> fail to provide strong support for the claimant's allegations of disabling
> symptoms and limitations.  *On January 22, 2003, she underwent a
> pulmonary function test (Exhibit 13F).  She achieved a
> postbronchodilator FVC of 1.40 or 45% of predicted and a
> postbronchodilator FEVI of 1.27 or 49% of predicted.  This was
> interpreted as a severe restriction.  Twenty days later, on February
> 11, 2003, she underwent a sleep study, which was dramatically
> positive.  However, she had good response to CPAP, with the ability
> to then proceed into REM sleep.  She required supplemental oxygen
> to help maintain her saturation.  It was recommended that she be
> treated on a nightly basis with CPAP.*
>
> * * * *
>
> She did not return to Gerry Medical Center until January 28, 2011,
> eight months since her last visit in May 2010 (Exhibit 1F).  Her
> treatment notes indicated that she had a history of hypertension,
> *exertional dyspnea*, back pain, and *smoking.  She reported that she
> had dyspnea when she walked approximately 50 feet.*  She further
> reported that she had a stress test done in years past, but that it was

negative.  *She denied any problems with chest pain or palpitations. She admitted that she smoked daily, but that she smoked less than a pack a day.*

Upon examination*, the claimant's lungs were clear bilaterally* (Exhibit 1F).  She was 5'6" tall, weighed 209 pounds, her BMI was 33, and her blood pressure was 142/88.  Musculoskeletal examination of her back revealed no tenderness on palpation.  Deep tendon reflexes were equivocal at the knees bilaterally.  She had normal 5/5 strength with knee flexion and extension as well as ankle flexion and extension.  *Additionally, she underwent a pulmonary function test, which revealed an FEVI of 1.22 or 42% of predicted with an FVC of 1.36 or 40% of predicted.  This was interpreted as a severe restriction.*

She was diagnosed with back pain but declined an MRI; *dyspnea with her pulmonary function tests showing severe restriction*; hypertension; and medical noncompliance (Exhibit 1F).

* * * *

On January 28, 2013, she presented to Primary Care of Southwest Georgia for medication refills (Exhibit 11F).  Dr. Brown's physical examination was essentially normal.  Her blood pressure was 163/94. She carried forward a diagnosis of chronic pain syndrome and hypertension.  Her Norco was refilled, her Toprol was stopped, and her Norvasc was increased.

Six months later, on July 26, 2013, she returned to Primary Care of Southwest Georgia complaining of a cough and congestion (Exhibit 11F).  She was also there to follow up on her hypertension (Exhibit 11).  Her blood pressure was 143/107.  She was diagnosed with a cough and hypertension.  *She was prescribed medications for her cough*, and her hypertension medications were refilled

* * * *

On December 23, 2013, she returned to Dr. Brown at Primary Care of Southwest Georgia (Exhibit 9F).  She wanted to discuss an x-ray and completion of disability paperwork.  She was 66 inches tall, weighed 187 pounds, her BMI was 30.18, and her blood pressure was 147/79.  She was diagnosed with hypertension, cardiomegaly, and a *cough.*  Her hypertension medication was refilled, and *she declined and [sic] echocardiogram and pulmonary function test.*

* * * *

*I give significant weight to the records of Dr. Crenshaw, which indicate that as recently as January 2014 the claimant raised no complaints and she denied any chest discomfort or shortness of breath* (Exhibit 12F).  Dr. Crenshaw was the claimant's treating nephrologist.  His records are well-supported by his own clinical examinations and testing, as discussed above, and are generally consistent with the record as a whole.  Furthermore, pursuant to 20 CFR 404.1527(d)(5) and 416.927(d)(5), we generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

* * * *

[On September 18, 2012,] Dr. Sampson [who performed a consultative examination] diagnosed chronic back pain, history of degenerative disease of lumbar spine, *history of obstructive sleep apnea (stable)*; and hypertension (Exhibit 4F).

Tr. 110-13 (emphasis added).

As noted, a January 22, 2003, a PFT was performed due to a diagnosis of pulmonary hypertension with dyspnea (shortness of breath) after walking less than 100 yards, productive cough, frequent wheezing, and a pack a day smoking history for 24 years.  Tr. 434.  Dr. Rosenblum

interpreted the PFT results, in part, to indicate "severe restriction."  Tr. 432-33.

By January 28, 2011, she was examined by Dr. Brown and reported shortness of breath when walking approximately 50 feet.  Tr. 307-08.  She continued smoking cigarettes daily, but less than a pack a day and was urged to quit smoking.  Plaintiff had PFT testing.  Tr. 308.  Dr. Brown opined that these results indicated a "baseline severe restriction." Tr. 308, 350.  She was diagnosed with, in part, dyspnea (shortness of breath).  *Id.*

On January 17, 2012, Plaintiff reported to Dr. Brown that she had reduced her smoking to one or two cigarettes daily, Tr. 346-47, although she continued to smoke, Tr. 307, 311, 315, 337, 340, 346, 359, 434, until she reported to Dr. Brown on July 13, 2012, that she stopped smoking in May 2012.  Tr. 340, 443.  (Except for Dr. Crenshaw's December 2013 and January 2014 impressions of "Tobaccoism" and plans for tobacco cessation discussed with Plaintiff, Tr. 416-17, 421, there is no evidence that Plaintiff continued to smoke after May 2012 through the date of the ALJ's decision. *See, e.g.*, Tr. 337, 384, 388, 407, 409-10.  But, it is uncertain whether

Plaintiff was smoking again between the ALJ's decision and the December 29, 2015.  ECF No. 16-1 at 3.)

By July 13, 2012, a review of systems indicated no chest pain or "dyspnea (shortness of breath)."  Tr. 341.  Plaintiff returned to Dr. Brown on August 1, 2012, and she had *no* dyspnea.  Tr. 338.  Plaintiff still abstained from smoking.  Tr. 337.

On September 18, 2012, Plaintiff underwent a consultative examination by Dr. Sampson who noted, in part, that Plaintiff's lungs were clear with good air entry and he diagnosed Plaintiff with "obstructive sleep apnea (stable)."  Tr. 361; *see supra* at 3-4 n.3.

On January 18, 2013, Plaintiff reported to Dr. Brown that she continued to abstain from smoking.  Tr. 409-10.  Her past medical history included hypertension and chronic pain, not dyspnea.  Tr. 409.  A review of symptoms indicated, in part, no chest pain or dyspnea (shortness of breath).  Tr. 410.  An assessment included chronic pain syndrome and hypertension only.  *Id.*

On July 26, 2013, Dr. Brown saw Plaintiff for a cough and head/chest congestion with "wheezing and mild dyspnea for 1 week."  Tr. 406-07.  She

had "good air movement."  Tr. 407.  Assessments included cough and

hypertension.  *Id.*  Plaintiff was prescribed an Albuterol inhaler to use four

times daily with a short course of steroids and bionics and patient

instructions included a notation, probable chronic obstructive pulmonary

disease (COPD) exacerbation and Plaintiff was to go to the emergency

room if no improvement within two days.  It was noted that her symptoms

improved with nebulized Albuterol treatment in-office.  She continued to

abstain from smoking.  Tr. 373-82, 407.

On November 20, 2013, Dr. Brown noted that Plaintiff continued to

abstain from smoking and used an Albuterol inhaler four times daily and a

course of steroids.  Tr. 387-88.  Respiratory examination showed "clear to

auscultation bilaterally."  Tr. 388.  November 25, 2013, chest x-rays (two

views) indicated, in part, that Plaintiff's "[l]ungs are clear of infiltrate or

effusion.  Heart is mildly enlarged.  Pulmonary vascularity is normal.  Bony

structures intact."  Tr. 439.  The impression stated: "Right diaphragmatic

elevation of unknown chronicity.  Cardiomegaly without evidence of failure."

*Id.*; *see* Tr. 446 (2003 chest x-ray).

On December 2, 2013, Dr. Crenshaw saw Plaintiff for a follow-up for her Chronic Kidney Disease Stage III in the setting of Hypertension. Tr. 419-21.  Upon examination, Plaintiff's symptoms included a cough and decreased appetite, although both were "better"; shortness of breath; and back and lower extremity pain.  Tr. 420.  She was alert and oriented. Tr. 420.

On December 23, 2013, Dr. Brown noted that Plaintiff continued taking both her Albuterol inhaler four times daily and her hypertension medication.  Tr. 384.  She was still abstaining from smoking.  *Id.  A review of systems indicated Plaintiff had a persistent cough*.  Tr. 385.  The diagnoses were hypertension, cardiomegaly and *cough*, but Plaintiff declined Dr. Brown's recommendation that she get an updated PFT due to her cough and an echocardiogram due to her cardiomegaly.  Tr. 385. There is no indication in this patient record that Plaintiff declined to have these tests due to financial reasons, *see* Tr. 385-86, notwithstanding her argument to the contrary.  *See* ECF No. 16 at 25; *see also supra* at 14 n.6.

On January 22, 2014, the last patient record before the ALJ and provided after the hearing, Dr. Crenshaw noted that Plaintiff raised *no* complaints and she *denied* any chest discomfort or shortness of breath, Tr. 414, as noted by the ALJ, Tr. 113.  A review of systems for pulmonary functions was negative and her lungs were clear.  Tr. 415.  "Tobaccoism" is noted as an impression and the plan included "consider tobacco cessation." Tr. 416-17.

On June 10, 2016, Plaintiff filed her memorandum with this Court. ECF No. 16.  Plaintiff attached several documents from Archbold Medical Center pertaining, in part, to December 29, 2015, pulmonary function lab results, almost two years after Dr. Crenshaw's January 22, 2014, notes, Tr. 415.  ECF No. 16-1 (Exhibit A).  Dr. Crenshaw referred Plaintiff for this "full study" performed by Craig E. Wolff, M.D.  *Id.*; *see supra* at 18-19.

Plaintiff's alleged disability onset date is July 24, 2012.  Tr. 106. Plaintiff was working in January 2003 and continued to work until July 2012.  Tr. 246, 255.  The fact Plaintiff continued to work and smoke at the time of the tests undermines her claim that the test results indicated that her condition was so severe as to prevent her from performing any gainful

activity.  *See* Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)

(indicating ALJ properly noted claimant's allegations were inconsistent with

his ability to work despite his impairment and lack of evidence that his

medical condition had worsened since then); Ellison, 355 F.3d at 1275-76

(holding that the fact that the claimant worked for several years in spite of

his seizure disorder supported ALJ's decision).  She was also smoking

when tested (PFT) in 2003 and 2011 and continued to smoke until May

2012, shortly before her alleged onset date.[14]  Tr. 307, 311, 315, 340, 343,

359, 434; *but see* ECF No. 16-1 at 3.  Also, Plaintiff declined a PFT when

offered by Dr. Brown on December 23, 2013, Tr. 385, a fact noted by the

ALJ.  Tr. 112.

By the date of the ALJ's decision of August 22, 2014, the last patient

record from Dr. Crenshaw of January 22, 2014, which includes Plaintiff's

report of no complaints and denial of chest discomfort and shortness of

breath, detracts from Plaintiff's argument.  A review of systems for

pulmonary functions was negative and her lungs were clear. Tr. 414-15.

(Dr. Crenshaw's plan included: "consider tobacco cessation."  Tr. 417.)

---

[14]  *See generally* Curry v. Astrue, 650 F. Supp. 2d 1169, 1177-78 (N.D. Fla. June 1, 2009).

At this time and since sometime in 2013, Plaintiff was not sleeping

with a CPAP due in large measure to her asserted inability to afford a

CPAP.  Tr. 22; *but see* Tr. 360 (Dr. Sampson noted in September 2012 that

Plaintiff stopped using the CPAP because she could not afford one, but her

sleep apnea symptoms "improved" with weight loss.)  In light of

Dr. Crenshaw's January 22, 2014, patient notes, it does not appear that

Plaintiff's inability to use a CPAP during this timeframe reduced her

functionality such that she could not work.

The ALJ did not err in not finding that Plaintiff had an impairment or

combination of impairments that met or medically equaled Listing 3.02.

Further, substantial evidence supports the ALJ's implicit

determination that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled Listing 3.02.

As noted herein, the evidence does not support Plaintiff's argument

that her impairments met or equaled Listing 3.02 during the relevant period.

Notwithstanding a rather elaborate colloquy that ensued during the hearing

between the ALJ and Plaintiff's counsel regarding the lack of record

evidence pertaining to this issue (*e.g.,* Plaintiff's sleep apnea), *see* Tr. 22-

28, Plaintiff and her counsel did not argue that she met the requirements of Listing 3.02.  Although Plaintiff mentioned in disability reports and other documents that she was disabled due to sleep apnea and shortness of breath, *see, e.g.*, Tr. 57, 66, 79, 89, 254, 269, 288, she did not mention chronic pulmonary insufficiency despite the fact that she was represented by an attorney.  *See, e.g.*, Tr. 8-56, 253-60, 269-76, 285-302.  Plaintiff did not indicate that she took medication, received treatment, or underwent testing for a pulmonary condition.  *See, e.g.*, Tr. 256-58, 289-90, 299-300.

At hearing, Plaintiff's counsel argued that Plaintiff had chronic bronchitis with shortness of breath, but counsel never mentioned Listing 3.02 or argued that her impairments met or equaled Listing 3.02.  Tr. 14.  When the ALJ asked Plaintiff about what conditions kept her from working, Plaintiff alleged problems, bad back, sleep apnea, kidney disease, hypertension, and depression, but she did not mention a pulmonary condition or even shortness of breath.  Tr. 20-22, 28-38.  Plaintiff's counsel also did not elicit any testimony from Plaintiff that suggested that she had a pulmonary condition or related symptoms.  Tr. 38-43.  As a result, the ALJ

was not required to discuss Listing 3.02.  *See generally* Robinson v. Astrue, 365 F. App'x 993, 996 (11th Cir. 2010) (unpublished).

Moreover, the medical evidence, discussed above, does not indicate that Plaintiff's impairments met or equaled Listing 3.02 during the relevant period.  As noted by the ALJ, there are PFT results from January 2003 and January 2011 (both substantially prior to her alleged onset date of July 2012), which indicated to Dr. Brown a "severe restriction."  Tr.110-11; *see supra* at 35-36.  But, there are problems with these results for the reasons stated herein.  *Id.*

Plaintiff smoked a pack of cigarettes a day for 24 years, but allegedly quit in May 2012 and continued her abstinence thereafter as reported in the record before the ALJ.  *But see* Tr. 416-17, 421; ECF No. 16-1 at 3.

In September 2012, Dr. Sampson, a consultative examiner, diagnosed Plaintiff with obstructive sleep apnea (stable).  Tr. 113.  Plaintiff declined, however, Dr. Brown's offer of a PFT in December 2013, after her alleged onset date.  Tr.112.  In January 2014, Dr. Crenshaw noted that Plaintiff raised no complaints and she denied any chest discomfort or shortness of breath.  Tr. 113.  All of this information was considered by the

ALJ and Plaintiff does not contend that the ALJ overlooked any evidence presented to him prior to his decision.

Given the minimal and somewhat dated medical evidence, including but not limited to the 2003 and 2011 PFT results that are at best inconclusive, *see supra* at 35-36, the ALJ was not required to discuss Listing 3.02.  *See generally* Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986).  Plaintiff did not meet her burden of proving that her impairments or combination of impairments met or equaled Listing 3.02 during the relevant period and she did not show that the ALJ was required to discuss Listing 3.02.

## B.  Court's Consideration of Post-Decision Evidence

Plaintiff attached to her memorandum the results of pulmonary function tests ordered by Dr. Crenshaw and performed by Dr. Wolff on December 29, 2015.  ECF No. 16-1.  The noted conclusion based on these results is "[m]ild-to-moderate restrictive lung disease" and "[s]ome additional restriction due to obesity may be present as well."  ECF No. 16-1 at 1.

There is a diagnosis of SOB (shortness of breath) and "[p]re-Op for transplant" and a reference to dyspnea, "[w]alking less than 100 yards." ECF No. 16-1 at 3.  Based on these results, Plaintiff argues that a remand is merited pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of whether her impairments met or equaled Listing 3.02 during the relevant period from her alleged onset date of July 24, 2012, to the date of the ALJ's decision on August 22, 2014.  ECF No. 16 at 22-25.

Evidence submitted to the district court may be considered only to determine if remand is warranted under section six 42 U.S.C. § 405(g). See Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1267-68 (11th Cir. 2007).  To satisfy the criteria for a remand under sentence six, a claimant must establish that the evidence is new and noncumulative; the evidence material such that a reasonable probability exists that would change the administrative result; and there was good cause for the failure to submit the evidence at the administrative level.  See Caulder v. Bowen, 791 F.2d 872, 877 (11th Cir. 1986).

The court has considered the evidence and remand is not warranted. The new evidence consists of PFT results from December 2015, more than

a year after the ALJ's decision on August 22, 2014.  Tr. 103.  The issue in a

disability case is whether a claimant is "entitled to benefits during a specific

period of time, which was necessarily prior to the date of the ALJ's

decision."  Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999).  It is at

best speculative that the December 2015 test results, when viewed with the

test results from 2003 and 2011 and other medical evidence of record,

including but not limited to Dr. Crenshaw's notes of January 2014 that

Plaintiff denied any chest discomfort or shortness of breath, Tr. 113, are

sufficient to establish that her impairments met or equaled Listing 3.02

during the relevant period.

　　As previously discussed herein, the medical evidence of record does

not support a conclusion that Plaintiff's impairments met or equaled Listing

3.02.  The medical evidence from the relevant period does not demonstrate

that Plaintiff met the basic requirements of Listing 3.02 - chronic pulmonary

insufficiency.  At most, the 2015 test results may show, subject to

interpretation and application by a medical source that Plaintiff's condition

worsened after the ALJ's decision, but any deterioration would not be

relevant to her condition on or before the date of the ALJ's decision.[15]

Wilson v. Apfel, 179 F.3d at 1279.  Given the evidence in the record and

the fact that the 2015 test results are from well after the ALJ's decision, the

December 2015 test results could not reasonably have been expected to

change the ALJ's decision and prove that Plaintiff's impairments met or

equaled a listing during the relevant period from her alleged onset date of

July 24, 2012, to the date of the ALJ's decision of August 22, 2014.

Plaintiff did not show that the December 2015 records were material and,

therefore, the evidence Plaintiff submitted to this Court does not warrant

remand under sentence six of 42 U.S.C. § 405(g).

### C.  The ALJ's Credibility Determination of Plaintiff

Plaintiff argues that the Commissioner's decision should be reversed

because the ALJ failed to properly apply the two-part part pain standard

used by the Eleventh Circuit.  ECF No. 16 at 25-30.

The credibility of the claimant's testimony must be considered in

determining if the underlying medical condition is of a severity which can

reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847

---

[15]  Plaintiff provided the court with the 2015 test results, but did not provide any patient records from any medical source(s) after the date of the ALJ's decision.

F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints

of pain, an ALJ may reject them as not credible.  *See* Marbury, 957 F.2d at

839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)); Moore v.

Barnhart, 405 F.3d at 1212 ("credibility determinations are the province of

the ALJ").  If an ALJ refuses to credit subjective pain testimony where such

testimony is critical, the ALJ must articulate specific reasons for questioning

the claimant's credibility.  *See* Wilson, 284 F.3d 1225.  Failure to articulate

the reasons for discrediting subjective testimony requires, as a matter of

law, that the testimony be accepted as true.  *Id.*  On the other hand, "[a]

clearly articulated finding with substantial supporting evidence in the record

will not be disturbed by a reviewing court."  Foote v. Chater, 67 F.3d 1553,

1562 (11th Cir. 1995).

Pain is subjectively experienced by the claimant, but that does not

mean that only a mental health professional may express an opinion as to

the effects of pain.  One begins with the familiar way that subjective

complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and
> other symptoms, the claimant must satisfy two parts of a
> three-part test showing:  (1) evidence of an underlying medical
> condition; and (2) either (a) objective medical evidence

confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225; see Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); 20 C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects).[16]  This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.

The ALJ considered Plaintiff's subjective complaints of pain and found that her medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  Tr. 110, 115-16.  As for her credibility, the ALJ noted "that her statements are internally inconsistent, a finding which tends to suggest that her allegations of disabling symptoms are less than credible."  Tr. 116.  As a predicate to this conclusion, the ALJ stated:

I have considered all the evidence of record and the testimony at the hearing.  However, the record, in its entirety, does not contain

---

[16]  The ALJ provided an extensive discussion of the two-part pain standard. Tr. 114-15.

objective signs and findings that could reasonably be expected to produce the degree and intensity of pain and limitations alleged by the claimant.  I further note that some pain and discomfort while working is not, per se, determinative of disability.  The issue is whether or not the claimant's pain is of such severity to preclude all work.  I find that several factors in this case lead me to conclude otherwise.  For instance, she testified that she experienced a level 8 pain on a ten-point scale for only one minute a day.  She admitted that she was not taking any pain medication, only hypertension medication.  She testified that she could only stand for 2 minutes and walk for only 5 minutes at one time; however, she admitted that she could wash dishes, wash clothes, and shop, activities which presumably require more than two minutes of standing and/or 5 minutes of walking.[17]  In February 2012, she had normal sensation and strength in both legs (Exhibit 3F).  In August 2012, her paraspinal muscle tenderness was mild (Exhibit 3F).  In September 2012, the consultative examination revealed the following:  normal range of motion in cervical spine, lumbar spine, and all joints; 5/5 motor strength throughout; normal gait; negative straight leg raises; and no tenderness, spasms, or pain in the back (Exhibit 4F).  In November and December 2013, she raised no back concerns, and a November 2013, physical examination revealed no spinal edema (Exhibit 9F).  In January 2014, she raised no complaints to her nephrologist [Dr. Crenshaw], and she denied any chest discomfort or shortness of breath (Exhibit 12F). Therefore, as for the issue of the claimant's

---

    [17]  The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  But see Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability). Although not expensive, Plaintiff's activities are not indicative of the disabling limitations she alleged.  Also, the ALJ did not unduly rely on Plaintiff's activities in deciding her claim nor did he find that Plaintiff's activities with dispositive evidence of her ability to work, as suggested by Plaintiff.

credibility, I note that her statements are internally inconsistent, a finding which tends to suggest that her allegations of disabling symptoms are less than credible.

With respect to the claimant's alleged functional restrictions and restricted daily activities, I find that the claimant's testimony is inconsistent with the objective abnormalities established by the record; thus, her testimony is not persuasive.  It is first noted that there are no diagnostic studies to show abnormalities which could reasonably be expected to produce symptoms anywhere near the level of severity alleged by the claimant.  The record does not reveal the existence of any severe, underlying impairment generally associated with the intractable, unrelenting, and totally disabling pain which, the claimant alleges as discussed in this decision.

In sum, the above residual functional capacity assessment is supported by the claimant's subjective complaints, the evidence of record, and the opinion of Dr. Patel.

Tr. 115-16.

The medical records and other evidence, discussed by the ALJ, do not indicate that Plaintiff's condition was as limiting as she alleged.

Tr. 110-16.  *See* Wilson, 284 F.3d at 1225-26.  Plaintiff was diagnosed with various conditions, but diagnoses do not establish work-related limitations.

*See* Moore, 405 F.3d at 1213 n.6.  Clinical examinations and diagnostic test did not reveal objective medical evidence that would support Plaintiff's allegations that her condition caused her disabling limitations, particularly for any continuous 12-month period.  *See, e.g.*, Tr. 111-16, 338, 341, 360,

362-64, 366, 385, 388, 407, 410, 415, 420, 427, 439-40.  See Barnhart v.

Walton, 535 U.S. at 217 (holding that a claimant's impairments and inability

to work must last for a continuous period of at least 12 months).

The undersigned has reviewed the entire record.  The objective

findings from the doctors who examined and treated Plaintiff do not indicate

that her condition was as limiting as she claimed.  Plaintiff did not prove

how the objective medical evidence supported her allegations of disabling

limitations.  For example, Plaintiff argues that her alleged pain may have

been due to her kidney disease, but she did not cite objective medical

evidence to support her argument.  *See* ECF No. 16 at 26.  Dr. Crenshaw,

who treated Plaintiff's kidney disease, noted that she complained of back

and leg pain, but he did not attribute her alleged pain to her kidney disease

and his objective findings do not indicate that her kidney disease or any

other condition that caused the disabling pain and other symptoms she

alleged.  *See, e.g.*, Tr. 415, 420, 427.

Plaintiff also argues that her pulmonary insufficiency and shortness of

breath caused or contributed to her alleged disability.  ECF No. 16 at 27-

28.  Plaintiff did not show, however, that she had a severe respiratory

impairment *during the relevant period* and the medical evidence does not

show that her alleged shortness of breath caused disabling or additional

limitations on her ability to work.  As noted herein, in January 2014,

Dr. Crenshaw noted that Plaintiff raised no complaints and she denied any

chest discomfort or shortness of breath.  Tr. 113.

Moreover, Plaintiff's doctors prescribed medication and basic

preventative care and a rather conservative routine course of treatment.

*See, e.g.*, Tr. 338, 341, 373, 385, 388, 407-08, 410, 416-17, 421, 425.

Plaintiff's routine and conservative treatment further undermine her

allegations of disabling limitations.  *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(v).

Plaintiff's treatment history and the unremarkable objective medical findings

indicate that her medications controlled her alleged symptoms.  Plaintiff's

lack of pain medication, *see, e.g.*, Tr. 30-31, 116, and the effectiveness of

the medication she did take are additional evidence showing that her

impairments were not as limiting as she claimed.  *See* 20 C.F.R.

§ 404.1529(c)(3)(iv)-(v).

In addition, no treating or examining doctor imposed limitations on

Plaintiff's ability to work, which provides further support for the ALJ's

evaluation of her subjective statements and his assessments of Plaintiff's RFC. *See* 20 C.F.R. §§ 404.1527, 404.1529(c), 404.1545(a)(3). Thus, the medical evidence provides substantial evidence to support the ALJ's determination that Plaintiff's subjective statements about her symptoms and limitations were not entirely credible.

In sum, Plaintiff did not meet her burden of providing sufficient evidence to support her subjective complaints of disabling symptoms and limitations. Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003). The ALJ properly considered the relevant evidence and performed his duty as the trier of fact in weighing and resolving any conflicts in the evidence. Phillips, 357 F.3d at 1240 n.8. Substantial evidence supports the ALJ's evaluation of Plaintiff subjective statements in his assessment of Plaintiff's RFC. Plaintiff did not meet her burden of proving that she could not perform her past relevant work as a housekeeper or the jobs identified by the VE. Tr. 49-52, 116-18; Jones v. Apfel, 190 F.3d at 1228. Substantial evidence supports the ALJ's findings and his conclusion that Plaintiff was not disabled within the meaning of the Act.

## VI. Conclusion

Plaintiff has the burden to prove she is disabled.  <u>Moore</u>, 405 F.3d at 1211.  The record does not support Plaintiff's assertion that she was disabled, that is, she was unable to engage in any substantial gainful activity due to a medically determinable impairment that can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 416(i) and 423(d)(1)(A).  Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **AFFIRMED** and the Clerk **DIRECTED** to enter judgment for Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on August 23, 2016.

**s/  Charles A. Stampelos_____**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Specific, written objections to these proposed findings and recommendations must be filed within 14 days after being served with a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not</u>**

**control.  A copy of the objections shall be served upon all other parties.  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636. A party may respond to another party's objections within 14 days after being served with a copy thereof.**